UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALFRED E. OWENS, JR.,

        Petitioner,

v.

SHERMAN CAMPBELL,

        Respondent.

Case No. 15-cv-12677
Hon. Matthew F. Leitman

_____/

## OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS (ECF NO. 1) AND (2) DENYING A CERTIFICATE OF APPEALABILITY

In 1996, a state-court jury found Petitioner Alfred E. Owens, Jr. ("Owens") guilty of first-degree murder, MICH. COMP. LAWS § 750.316, second-degree murder, MICH. COMP. LAWS § 750.317, assault with intent to murder, MICH. COMP. LAWS § 750.83, and three counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b (the "1996 Convictions"). Owens is currently serving a mandatory life sentence for the 1996 Convictions in the custody of the Michigan Department of Corrections.

Two of the key prosecution witnesses at Owens' 1996 trial were Antonio Williams ("Antonio"[1]) and Joseph Carson ("Carson"). In 2012, Antonio and Carson

_____

[1] The Court normally refers to parties and witnesses by their last names. However, in this case, several individuals share the same last name. For ease of reference, the

1

signed affidavits in which they recanted their testimony from Owens' 1996 trial and said that a state prosecutor and/or certain police officers induced them to falsely implicate Owens (the "Antonio Recanting Affidavit" and the "Carson Recanting Affidavit"). With the Antonio and Carson Recanting Affidavits in hand, Owens moved the state court to vacate the 1996 Convictions. The state trial court declined to do so, and the state appellate courts declined to hear the matter.

Owens then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 (the "Petition") in this Court. In the Petition, Owens claims, based on the Antonio and Carson Recanting Affidavits, that (1) the state prosecutor knowingly offered perjured testimony at his 1996 trial, (2) the prosecutor withheld exculpatory evidence from the defense, and (3) newly discovered evidence demonstrates that he (Owens) is actually innocent. (*See* Pet., ECF No. 1.)

Respondent argues, among other things, that Owens' claims are time-barred by the statute of limitations in 28 U.S.C. § 2244(d)(1)(A). That statute requires a habeas petitioner to file his petition not more than one year after his "judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Respondent contends that Owens'

Court will refer to many of these individuals by their first names. The Court does not mean any disrespect by its use of first names.

claims are tardy under this statute because the 1996 Convictions became final long before 2012.

Owens counters that his claims are timely under a different statute of limitations – the one found in 28 U.S.C. § 2244(d)(1)(D). That statute permits a habeas petitioner to file his petition within one year from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D) Owens contends that his claims may proceed under this statute because he had no idea (and could not reasonably have known) that Carson or Antonio would recant until 2012, when Carson voluntarily came forward and offered to do so. Owens says that at that point, he reached out to Antonio, and Antonio also agreed to recant. Owens' theory is that he acted with due diligence because once Carson came forward, he moved promptly to contact Antonio, obtain the Carson and Antonio Recanting Affidavits, file a motion for relief from judgment in state court, and, finally, to file the Petition when the state court denied relief.

For two independent reasons, the Court concludes that Owens' claims are not timely under 28 U.S.C. § 2244(d)(1)(D). First, Owens' theory that he acted with due diligence is not supported by reliable evidence. Owens' theory of due diligence – indeed, his entire explanation of the circumstances leading up to the filing of the Petition – rests primarily upon the testimony of Owens, Carson, and Owens' brother,

Will Owens ("Will"). The Court heard from those three witnesses at an evidentiary hearing, and it finds that the witnesses and their testimony are neither credible nor reliable. Second, the record affirmatively demonstrates a lack of due diligence. In 2000 – more than ten years before Owens first asserted the claims in the Petition – Carson offered additional sworn testimony in which he both recanted at least some material aspects of his 1996 testimony against Owens and accused the law enforcement officers who investigated Owens of committing misconduct. Yet, Owens did nothing to follow up on Carson's recantation and accusations. This lack of diligence further – and independently – persuades the Court that Owens' federal habeas claims are not timely under 28 U.S.C. § 2244(d)(1)(D).

In the alternative, Owens argues that the limitations period should be equitably tolled based upon his showing that he is actually innocent of crimes that comprise the 1996 Convictions. However, like Owens' theory of due diligence, Owens' claim of actual innocence is not supported by sufficient reliable evidence. The Court therefore declines to toll the statute of limitations based upon Owens' purported actual innocence.

Accordingly, for the reasons explained in detail below, the Court **DENIES** the Petition because it is time barred. The Court further **DENIES** Owens a certificate of appealability.

**I**

The essential facts and procedural history relevant to issues now before the Court are as follows.

**A**

Owens' convictions arise of the shootings of Antonio, Ricky Munson ("Munson"), and Akemji Williams ("Akemji") on September 18, 1994. Munson and Akemji died from the gunshots; Antonio was seriously injured.

The morning after the shooting, Owens and his wife Melissa Owens ("Melissa") left Michigan and traveled to Tennessee. (*See* 3/30/2019 Evid. Hrg. Tr., ECF No. 19, PageID.3381.) While in Tennessee, Owens learned that he was wanted by law enforcement authorities for the shootings. (*See id.*) But he did not turn himself in. Instead, he took refuge in a Nashville apartment. (*See id.*) Authorities eventually tracked Owens down in the apartment and attempted to arrest him. (*See id.*) Owens initially barricaded himself in the apartment, but he eventually surrendered to authorities and was brought back to Michigan to stand trial. (*See id.*, PageID.3381-3382.)

Owens was charged with the murders of Munson and Akemji, the attempted murder of Antonio, and various gun possession offenses. Owens was first tried on these charges in 1995, but the trial ended in a mistrial. Owens was brought to trial

on these charges a second time in 1996 ("Owens' Underlying 1996 Trial"), and he was convicted on all charges at that trial.

Two of the key prosecution witnesses at Owens' Underlying 1996 Trial were Antonio and Carson. Antonio testified that about four to six weeks before the shootings, he and Akemji went to purchase crack cocaine from Owens. (*See* 4/23/1996 Trial Tr. at 371, ECF No. 5-22, PageID.2108.) When they met up with Owens, Owens was with Brice Allen ("Brice") and Gerry Allen ("Gerry"). (*See id.*) Antonio said that at the meeting, Owens said that he (Antonio) and Akemji were going to have to kill a rival drug dealer named Myron Milton[2] ("Milton"). (*See id.* at 374, PageID.2111.) Antonio testified that he and Akemji said that they would not be involved in killing Milton and that Owens then "got mad" and told them that they "knew too much of his business." (*Id.* at 374-377, PageID.2111-2114.)

Antonio then testified that two to three weeks before the shooting, he, Akemji, Carson, and others drove to a location on Montana Street in Pontiac, Michigan. (*See id.* at 382, PageID.2119.) Antonio said that when they arrived, they met with four men – Owens, Brice, Gerry, and a man known as "Fat Howard." (*Id.* at 384, PageID.2121.) Antonio told the jury that during this meeting, Owens again said that he (Owens) intended to kill Milton and that he (Owens) wanted Antonio and Akemji

---

[2] Milton also goes by the name "Quincy." Throughout Antonio's testimony, and at other points in the record, Milton is referred to as "Quincy."

to set Milton up for the hit. (*See id.* at 384-388, PageID.2121-2125.) Antonio said that he and Akemji refused to participate in Owens' plot to kill Milton and that Owens then angrily told them that they had been "playing with [him] too long." (*Id.* at 387, PageID.2124.)

Antonio next testified that on the evening of September 17, 1994 (hours before the shooting in the early morning of September 18), he and Akemji were driving in Akemji's car with a third man named Germaine Selvy ("Selvy"). (*See id.* at 393-395, PageID.2130-2132.) According to Antonio, as they pulled into the parking lot of a store, Selvy saw Owens and Brice sitting in a parked car. Selvy cried out that he saw Brice reach for a gun, and Akemji began to drive the vehicle away from the parking lot. (*See id.* at 395-403, PageID.2132-2140.) As Akemji was driving away, Selvy fired shots at the vehicle in which Owens and Brice were sitting. (*See id.*)

Antonio then testified that later that same evening, he and Akemji were parked near an after-hours gambling establishment waiting to pick up Akemji's mother. (*See id.* at 401-405, PageID.2138-2142.) Antonio said that as they were waiting, Munson approached the car to ask for a ride. (*See id.* at 405-406, PageID.2142-2143.) Antonio further testified that Owens then approached the car with a gun in his hand and fired shots into and towards the vehicle. (*See id.* at 406-410, PageID.2143-2147.) Antonio was shot six times, but he survived. Akemji and Munson were each also shot, and they died from their wounds.

Antonio finally testified that he told the police that Owens was the shooter while he was hospitalized after the shooting. (*See id.* at 416-418, PageID.2153-2155.) He said he learned that his sister had been receiving threats from persons that Antonio believed were associated with Owens. (*See id.*) He said that he did not want his sister to be harmed, so he decided to inform the police that Owens was the shooter. (*See id.*) At the time that Antonio made that decision, he could not speak because he had a tube in his throat to help him breathe. (*See id.*) He wrote the names of Owens and Brice on a sheet of paper that was given to the police. (*See id.* at 418-421, PageID.2155-2158.)

Carson also testified as a key prosecution witness at Owens' Underlying 1996 Trial. Carson described interactions that he had had with both Milton and Owens. He first told the jury that Milton paid him money to kill Owens and that he took the money but had no intention of killing Owens. (*See* 4/25/1996 Trial Tr. at 568, ECF No. 5-23, PageID.2305.) Carson then testified that after he took the money from Milton, he (Carson) had contact with Owens when they both reported to their parole officers in Pontiac. (*See id.* at 569, PageID.2306.) Carson told Owens that he had taken money from Milton, and Carson assured Owens that he (Carson) was not going to kill him (Owens). (*See id.*) Carson had this conversation with Owens because Carson was concerned that if Owens heard about the payment from Milton, Owens

would try to harm Carson based on the mistaken belief that Carson actually intended to kill him. (*See id.* at 569-570, PageID.2306-2307.)

Carson then corroborated Antonio's account of Antonio's meeting with Owens on Montana Street (described above). Carson testified that he was present at that meeting with Owens, Antonio, Akemji, and others, and Carson confirmed that at the meeting Owens asked Antonio and Akemji to lure Milton to a meeting where Milton would be killed. (*See Id.* at 569-578, PageID.2306-2315.) Carson echoed Antonio's testimony that Antonio and Akemji refused to lure Milton and, more importantly, that their refusal upset Owens. (*See id.* at 576-577, PageID.2313-2314.) Carson also testified that Owens "always" said he was not "going to leave no witnesses" to his crimes. (*Id.* at 587-579, PageID.2315-2316.) Carson further testified that he had not been promised anything in exchange for his trial testimony and that he did not expect any help or benefit from police or prosecutors in exchange for his testimony. (*See* 4/29/1996 Trial Tr. at 669-672, ECF No. 5-24, PageID.2406-2609.)

Owens presented an alibi defense at trial. He claimed that he was playing cards at a hotel on the night of the shooting. His wife Melissa testified in support of his alibi defense.

The jury convicted Owens of first-degree murder, MICH. COMP. LAWS § 750.316, second-degree murder, MICH. COMP. LAWS § 750.317, assault with intent

to murder, MICH. COMP. LAWS § 750.83, and three counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b.

## B

Following the 1996 Convictions and sentencing, Owens filed a claim of appeal in the Michigan Court of Appeals. His appellate brief raised the following three claims:

> I. Alfred Owens was denied his right to a fair trial when the trial court admitted inflammatory evidence relating to his arrest after refusing to balance the probative value of said evidence against the unfair prejudice resulting therefrom.
>
> II. The numerous instances of prosecutorial misconduct denied the defendant the right to a fair trial and violated his due process rights under the Fifth Amendment, Sixth Amendment, Fourteenth Amendment, and Const. 1963, art. I, §20.
>
> III. Alfred Owens' convictions were against the great weight of the evidence, as the only direct evidence that he committed the crimes came from a person who claimed that he first did not know who shot him, then changed his mind nine days later, and there was no circumstantial evidence at all upon which a conviction could have properly been based.

The Michigan Court of Appeals affirmed the 1996 Convictions in an unpublished opinion. *See People v. Owens*, No. 195521 (Mich. Ct. App. June 27, 1997). Owens filed an application for leave to appeal in the Michigan Supreme

Court, but it was denied by standard order on June 29, 1998. *See People v. Owens*, 587 N.W.2d 634 (Mich. 1998) (Table).

**C**

In 2000, Owens was charged with a different but related crime – solicitation of the murder of Milton.  The solicitation charge was based, in part, on Owens' conduct at the Montana Street meeting that Antonio and Carson had described to the jury at Owens' Underlying 1996 Trial.  Simply put, after persuading a jury to convict Owens for shooting Antonio and killing Akemji in Owens' Underlying 1996 Trial, the prosecution sought to convict Owens for his alleged solicitation of Milton's murder that occurred, in part, during the run-up to the shooting of Antonio and Akemji.

Antonio and Carson both testified at the preliminary examination in the solicitation case.  During their testimony, both described the Montana Street meeting in a manner that was largely consistent with their testimony from Owens' Underlying 1996 Trial.  Carson also described additional discussions that he had with Owens in July of 1994 in which Owens allegedly asked Carson to assist in locating Milton in Pennsylvania (where Milton apparently was at the time) so that Milton could be killed. (*See* Prelim. Exam. Tr. at 41-46, ECF No. 28-2, PageID.4044-4050.)

The prosecution then called Antonio and Carson as witnesses at the trial in the solicitation case. Antonio again testified in a manner that was generally consistent with his testimony in Owens' Underlying 1996 Trial. But Carson did not.

Carson acknowledged meeting Owens at the parole office and discussing with Owens that he had accepted money from Milton to kill Owens. However, Carson then testified that, to his knowledge, Owens thereafter did not raise with him any issues related to Milton. (*See* 1/21/2000 Trial Tr. at 577, ECF No. 28-6, PageID.4552). Carson told the jury that he did not have any discussions with Owens about Milton "besides the one at the parole office…." (*Id.* at 584, PageID.4554.) He then testified that "to [his] knowledge," Owens did not "ask him to do something" in late July or August of 1994 and that he did not recall Owens asking him get Antonio and Akemji to call Milton. (*Id.* at 610-612, PageID.4560.) All of this testimony directly contradicted Carson's testimony from Owens' Underlying 1996 Trial in which he explained that after meeting Owens at the parole office, he (Carson) participated in the Montana Street meeting with Owens during which Owens (1) asked Antonio and Akemji to lure Milton to his death and (2) became upset when they declined to do so. In addition, Carson also testified at the solicitation trial that the police officers who were investigating the solicitation by Owens – the same officers who were involved in the investigation of Owens for the crimes at issue in Owens' Underlying 1996 Trial – manipulated a recording of their interview with

him by turning the recorder on and off at various points during the interview. (*See* 1/24/2000 Trial Tr. at 766, 831, ECF No. 28-7, PageID.4608, 4673.)  Finally, Carson further testified that the same officers may have instructed him to falsely say that they (the officers) had not promised him anything in exchange for his testimony. (*See id.* at 766-767, PageID.4608-4609.)

The trial judge at the solicitation case eventually declared Carson unavailable based upon lack of memory,[3] and the judge permitted the prosecution to read Carson's preliminary examination testimony to the jury.  On subsequent cross-examination, Carson admitted that elements of his trial testimony were "contrary to everything [he had previously] said" about the "whole case." (*Id.* at 822, PageID.4664.)

There is no indication in the record that Owens (or anyone acting on Owens' behalf) attempted to contact Carson in 2000 after Carson's trial testimony in the solicitation case in order to discuss Carson's changed testimony and/or his suggestions that the law enforcement officers investigating Owens had attempted to manipulate evidence and falsify testimony.  Nor is there any indication that Owens

---

[3] While Carson did have a lack of memory with respect to many issues, he did not express uncertainty or lack of memory when he testified that Owens never spoke to him (Carson) about Milton after their discussion at the parole office – and that testimony was flatly inconsistent with Carson's testimony at Owens' 1996 Underlying Trial.

engaged a lawyer at that time to explore whether he could obtain relief from the 1996 Convictions based upon Carson's 2000 testimony.

## D

In 2009, Owens' brother Will contacted attorney James Sterling Lawrence ("Lawrence") about the possibility of Lawrence representing Owens. (*See* 4/22/2019 Lawrence Aff. at ¶2, ECF No. 20, PageID.3514.)  Lawrence then contacted Owens for the first time. (*See id.*)  It does not appear that Owens hired Lawrence at that time.

In January 2011, Owens did formally hire Lawrence to review the proceedings that led to the 1996 Convictions and to offer an assessment of Owens' options for attacking the convictions. (*See id.* at ¶¶ 4-5, PageID.3514.) Among other things, Lawrence reviewed preliminary examination transcripts, portions of the transcripts from Owens' first trial (the trial that ended in a hung jury), and the transcript of Owens' Underlying 1996 Trial (the trial that ended with Owens' convictions). (*See* 6/10/2011 Lawrence Ltr., ECF No. 26-3.)  Then, by letter to Owens dated June 10, 2011 (with a copy to Owens' brother, Will), Lawrence reported the results of his preliminary review. (*See id.*)  The letter included a summary of the testimony at Owens' Underlying 1996 Trial, including the testimony provided by both Carson and Antonio. (*See id.*)

In July 2011, Owens and Will spoke by telephone and appeared to discuss possible strategies for attacking Owens' 1996 Convictions. It appears that during this conversation, Will reported to Owens that (1) he (Will) had discussed with Lawrence the possibility of seeking recantations from Antonio and from Carson and (2) Lawrence suggested making recantation "the last issue" in any attack of the convictions because witnesses who initially offer to recant sometimes back away from their recantations. (7/29/2011 Call Tr., ECF No. 23-3, PageID.3550.)

Between July 2011 and February 2012, Lawrence conducted further analysis of Owens' case. By letter dated February 14, 2012, Lawrence provided an update to Owens (with a copy to Will). (*See* 2/14/2012 Lawrence Ltr., ECF No. 28-10.) In this second letter, Lawrence reported that he had completed his review of the transcripts from Owens' first trial (the one that ended in a hung jury) and had met with Will. (*See id*.) Importantly, Lawrence told Owens that, based upon his review of all of the trial transcripts and his discussions with Will, "it appears that at one point Joseph Carson was willing to recant, and also Antonio Williams, may be willing to recant." (*Id*., PageID.4864.) Lawrence told Owens that the potential willingness of these witnesses to recant "needs to be investigated and both gentlemen are either on probation or parole." (*Id*.)

According to Owens, before he followed up on Lawrence's suggestion to investigate, Carson came forward on his own and offered to recant. As described in

much more detail below, Owens says that in the Spring of 2012, Carson approached his (Owens') mother, said that his testimony against Owens at Owens' Underlying 1996 Trial was false, and offered to recant. Owens' mother then supposedly informed Will about Carson's willingness to recant, and Will informed Lawrence. Lawrence next obtained the Carson and Antonio Recanting Affidavits, and then Lawrence filed a motion for relief from judgment in state court based upon those affidavits.

## E

Lawrence filed Owens' motion for relief from judgment in state court on February 5, 2013. The motion raised the following claims:

> I. Defendant's issues should properly be heard on the merits.
>
> II. Newly discovered evidence demonstrates defendant was denied a fair trial and requires a new trial.
>
> III. Defendant was denied a fair trial by the prosecutor's knowing use of perjured testimony, that she failed to correct.
>
> IV. The failure to provide defendant access to evidence necessary to present a defense and suppression of *Brady* material prejudiced defendant and denied a fair trial and due process.

Owens supported his motion for relief from judgment with the Antonio and Carson Recanting Affidavits. In the Antonio Recanting Affidavit, which was dated September 7, 2012, Antonio claimed in relevant part that:

- Contrary to his testimony at Owens' Underlying 1996 Trial, he does not know who the gunman was.

- The police provided him with the piece of paper that had Owens' and Brice's names already written on it while he was in the hospital.

- He was not at any meetings with Owens to discuss killing Milton, but he gained information about such meetings through Akemji, the police, and the prosecutor.

- During the incident where he was shot, he ducked down when he heard gunfire and did not see who fired the shots.

- A police officer and prosecutor told him that Owens was the shooter and told him other facts that Antonio could use during his testimony at Owens' Underlying 1996 Trial.

- A prosecutor told him that if he cooperated and gave the testimony the prosecution wanted, things would go easier on Antonio's mother and brother who were incarcerated at the time and up for parole.

(*See* Antonio Recanting Affidavit, ECF No. 1-2, PageID.99-103.) The Antonio Recanting Affidavit did not say that Antonio was ever unwilling to recant his testimony; it was silent about when Antonio was first willing to offer his sworn recantation.

In the Carson Recanting Affidavit, which was signed on November 19, 2012, Carson claimed in relevant part that:

- He was a drug dealer in Pontiac at the time of the shooting.

- He knew Owens and Milton.

- He took money from Milton to kill Owens, but he did not intend to kill Owens.

- Prior to Owens' Underlying 1996 Trial, he was told by police that he had charges against him for solicitation to murder, safe cracking, drugs, and robbery.

- He testified against Owens at Owens' Underlying 1996 Trial in exchange for those charges being dismissed.

- He falsely implicated Owens in the murders.

- He falsely testified at Owens' Underlying 1996 Trial that he had no deal in exchange for his testimony, when in fact charges against him were dismissed, he received special conjugal visits in jail, and he received parole recommendation letters from the authorities.

(*See* Carson Recanting Affidavit, ECF No. 1-3, PageID.104-105.)

Unlike the Antonio Recanting Affidavit, the Carson Recanting Affidavit did indicate that there was a period during which Carson would not give a sworn recantation. Carson said that he was unwilling to sign a recanting affidavit until he was "released on parole." (*Id.*, PageID.105.) In a later affidavit submitted to this Court, Carson clarified that "released on parole" meant "discharged" from parole supervision – a discharge that occurred in 2012. (ECF No. 12-2, PageID.3311.) Simply put, Carson contended that he was not willing to offer a sworn recantation until 2012.

The state trial court denied Owens' motion for relief from judgment in an Opinion and Order dated January 16, 2014. (*See* ECF No. 5-30.) The court first held

that Owens was not entitled to relief because he failed to satisfy Michigan Court Rule 6.508(D)(3). (*See id.*, PageID.2932-2934.)  That rule provides that a defendant is not entitled to relief from judgment based upon a ground that could have been raised on direct appeal unless the defendant shows both "good cause" for failing to raise the issue and "actual prejudice" from the complained-of error.  The trial court held that Owens failed to show "good cause" for not raising his claims on direct appeal.  The court rejected Owens' argument that he could not have raised the claims earlier because the claims were based upon newly discovered evidence – namely, the Antonio and Carson Recanting Affidavits.  The court concluded that while the Antonio and Carson Recanting Affidavits were signed shortly before Owens filed his motion, the affidavits did not clearly indicate when Owens learned of the information in the affidavits. (*See id.*, PageID.2933-2934.)  For that reason, the trial court ruled that Owens failed to show that the information in the Antonio and Carson Recanting Affidavits was newly discovered and that he could not have raised issues related to the affidavits on direct appeal. (*See id.*)

The state trial court also ruled that Owens' claims failed on the merits.  The court noted that recanting affidavits are "traditionally regarded as suspect and untrustworthy." (*Id.*, PageID.2935.)  The court then concluded that Owens was not entitled to a new trial because he "has not clearly established either the veracity of [the Antonio Recanting Affidavit] or the falsity of [Antonio's] trial testimony." (*Id.*)

The court likewise concluded that Owens "has not clearly established either the veracity of [the Carson Recanting Affidavit] or the falsity of [Carson's] trial testimony." (*Id.*, PageID.2936.)

Owens filed an application for leave to appeal in the Michigan Court of Appeals, but it was denied by form order. *See People v. Owens*¸ No. 322729 (Mich. Ct. App. Aug. 28, 2014). Owens then applied for leave to appeal in the Michigan Supreme Court, but on April 28, 2015, it, too, denied leave. *See People v. Owens*, 862 N.W.2d 187 (Mich. 2015) (Table).

**F**

Owens filed the Petition in this Court on July 29, 2015. (*See* Pet., ECF No. 1.) In the Petition, Owens presents three claims: (1) that he was denied due process of law by the state prosecutor's knowing use of perjured testimony; (2) that he was denied due process of law by the state prosecutor's failure to disclose known exculpatory evidence; and (3) that newly discovered evidence demonstrated that he was denied due process of law. (*See id.*, PageID.6-11.)

Owens recognizes that the Petition – which seeks relief from convictions obtained at Owens' Underlying 1996 Trial that became final on direct review more than twenty years ago – "[o]bviously … raises a question of timeliness." (*Id.*, PageID.28.) He addresses that question in the Petition. Owens contends that his

claims are timely under 28 U.S.C. § 2244(d)(1)(D)[4] because he "could not with reasonable diligence have uncovered the evidence [in the Antonio and Carson Recanting Affidavits] earlier…." (*Id*., PageID.34.) Owens contends that he did not have any reason to contact Antonio to see if he (Antonio) would recant until Carson came forward and recanted – which, according to Owens, first happened in the spring of 2012. (*See id.*, PageID.34-35.) And Owens insists that he could not have sought relief from his convictions until both Carson *and* Antonio recanted. (*See id.*) In the alternative, Owens contends that any limitations period should be equitably tolled and/or the Court may reach the merits of his claims because he has made a showing that he is actually innocent of the crimes for which he was convicted. (*See id.*, PageID.5-6.)

Respondent filed an Answer in Opposition to the Petition on February 4, 2016. (*See* ECF No. 4.) In the Answer, Respondent argues, among other things, that Owens' federal habeas claims are barred by the one-year statute of limitations in 28 U.S.C. § 2244(d)(1)(A)[5] because Owens filed the Petition more than one year after his convictions became final on direct review. (*See id.*)

---

[4] As explained above, this limitations provision states that a habeas petition must be filed within one year of "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."

[5] This limitations provision states that a habeas petition must be filed within one year from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."

# G

After some preliminary proceedings and supplemental briefing, the Court decided to hold a limited evidentiary hearing to inquire into (1) the timeliness of the Petition and (2) whether Owens was actually innocent of the crimes that comprise the 1996 Convictions. (*See* Order, ECF No. 15.)  The Court held the evidentiary hearing on March 20, 2019.  Owens called four witnesses at the hearing: himself, Carson, his mother Rosetta Bush, and his brother Will.

In an attempt to support his theory that he acted with due diligence and his claim of actual innocence, Owens elicited the following testimony from his witnesses on direct examination at the evidentiary hearing:

Owens' Key Direct Testimony

- Antonio and Carson testified falsely against him at Owens' Underlying 1996 Trial, and he knew their testimony was false when it was offered against him. (*See* 3/20/2019 Evid. Hrg. Tr., ECF No. 19, PageID.3362.)

- In 2012, he first learned – from his mother and brother – that Antonio and Carson were willing to recant their testimony from Owens' Underlying 1996 Trial. (*See id.*, PageID.3363.)

- Before hearing from his family that Carson would recant, he did not have "any reason" to believe that Antonio or Carson would recant that testimony. (*Id.*)

- He did not shoot anybody. (*See id.*, Page ID.3363-3364.)

## Carson's Key Direct Testimony

- His trial testimony against Owens at Owens' Underlying 1996 Trial was false. (*See id.*, PageID.3398.) Contrary to that testimony, (1) Owens did not ask Antonio and Akemji to lure Milton to his death, and (2) he (Carson) did receive promises of benefits in exchange for his testimony against Owens. (*See id.*, PageID.3402-3403.)

- At some point after testifying against Owens at Owens' Underlying 1996 Trial, he was in custody with Antonio at the Muskegon Correctional Facility. (*See id.*, PageID.3407). They spoke to one another and acknowledged that they had both testified falsely against Owens at Owens' Underlying 1996 Trial. (*See id.*, PageID.3407-3408.)

- During his conversation with Antonio at the Muskegon Correctional Facility, he and Antonio "agreed to change [their] testimony [against Owens], to find a way we could get [their] testimony changed." (*Id.*, PageID.3408.)

- At that time, Owens and Antonio were "both incarcerated" so they "didn't do anything then." (*Id.*)

- In 2012, he decided to reveal to Owens' mother (Rosetta Bush) the falsity of his testimony at Owens' Underlying 1996 Trial. He admitted his perjury to Ms. Bush because he had changed his lifestyle and wanted to make things right. (*See id.*, PageID.3401.)

- He later told Owens' brother, Will, that his testimony at Owens' Underlying 1996 Trial was false and that he would sign an affidavit admitting the falsity. (*See id.*, PageID.3399-3400.)

- He was unwilling to sign a recanting affidavit in 2009 because he was on parole at that time, and he worried that his parole would be revoked in retaliation for recanting. He was unwilling to sign a recanting affidavit until he was discharged from parole. (*See id.*, PageID.3405.) At some point after he was discharged from parole, he signed the Carson Recanting Affidavit.

- After he was discharged from parole and agreed to sign the Carson Recanting Affidavit, he "ran back into [Antonio] … [a]nd [Antonio] said he would be willing to do an affidavit as well." (*Id.*, Page ID.3408.)

Rosetta Bush's Key Direct Testimony

- Carson came to her house at some point in 2012. (*See id*., PageID.3490.)   The weather was "bright and sunny," and she believes the visit occurred in April or May. (*Id*.)  But it may have been later. (*See id*.)

- During the visit, Carson admitted that he testified falsely at Owens' Underlying 1996 Trial. (*See id.*, PageID.3489-90.)

- Carson said that he was admitting to his perjury because he had changed his way of life. (*See id.*)

- Before Carson came to her house, she was not aware that he was going to recant his trial testimony against Owens. (*See id.*, PageID.3490.)

Will Owens' Key Direct Testimony

- In the Spring of 2012, his mother, Rosetta Bush, told him that Carson had come to her house and recanted his testimony against Owens that Carson had given at Owens' Underlying 1996 Trial. Prior to that time, he was not aware that Carson intended to recant. After he learned of Carson's contact with his mother, he spoke to Carson, and Carson gave him contact information for Antonio. (*See id.*, PageID.3493-3494.)

- He spoke with Antonio, and Antonio said that he was willing to recant his testimony against Owens from Owens' Underlying 1996 Trial.  He told Antonio that an attorney would be contacting him to follow up. (*See id.*, PageID.3494.)

- He and Rosetta Bush had not hired an attorney to pursue post-conviction relief for Owens at the time Carson recanted to Ms. Bush. He hired attorney Lawrence to pursue such relief "several weeks" after Ms. Bush informed him that Carson had stopped by her home and recanted. (*Id.*)

Owens was unable to call Antonio as a witness because Antonio had apparently died several years before the evidentiary hearing. Respondent did not call any witnesses.

Following the hearing, Owens and Respondent submitted supplemental briefing on the limitations and actual innocence issues. (*See* ECF Nos. 26, 28.) Owens attached to his supplemental brief records from the Michigan Department of Corrections showing that Carson and Antonio were both inmates at the Muskegon Correctional facility from January 13, 2000, to January 27, 2000, and again from November 1, 2000, to November 17, 2000. (*See* ECF No. 26, PageID.3929; ECF No. 26-1, PageID.3938-3946; ECF No. 26-2, PageID.3947-3949.) These records fix the time-frame for the conversation, described by Carson on direct examination at the evidentiary hearing, in which he and Antonio agreed to recant the false testimony that they provided against Owens at Owens' Underlying 1996 Trial.

## II

### A

Prisoners seeking federal habeas corpus relief from a state court judgment face a one-year statute of limitations. The pertinent statutory provision states:

25

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of —

>(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

>(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

>(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

>(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d). Absent equitable tolling or some other exception to the limitations period, a habeas petition filed outside the prescribed time period is subject to dismissal. *See Jurado v. Burt*, 337 F.3d 638 (6th Cir. 2003); *Wilson v. Birkett*, 192 F. Supp. 2d 763, 765 (E.D. Mich. 2002) (dismissing untimely habeas petition).

**B**

Owens argues that his claims are timely under 28 U.S.C. § 2244(d)(1)(D), which, as noted above, permits a habeas petitioner to file his claims within one year of "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." A habeas petitioner who invokes this limitations provision "bears the burden of proving that he exercised due diligence, in order for the statute of limitations to begin running from the date he discovered the factual predicate of his claim." *DiCenzi v. Rose*, 452 F.3d 465, 471 (6th Cir. 2006).

Owens first presented the claims in the Petition to the state court in February 2013, and he then filed the Petition in this Court on July 29, 2015. In order to show that the claims in the Petition are timely under 28 U.S.C. § 2244(d)(1)(D), Owens must show that, through the exercise of due diligence, he could not have discovered the factual predicate for the claims before on or about May 8, 2012 (this period accounts for tolling the period during which the claims were pending in state court).[6]

---

[6] Owens filed the Petition on July 29, 2015. The Petition was timely if Owens filed it within one year (365 days) after the factual predicate for his claims could have been discovered through the exercise of due diligence. But the one-year time period is tolled during the period that Owens' post-conviction review proceedings were pending before the state courts. Those proceedings were pending for 812 days (from February 5, 2013, through April 28, 2015). Thus, Owens' claims are timely if the factual predicate for them could first have been discovered through the exercise of due diligence 1177 days before he filed the Petition. The 1177 days is the 365-day

For two separate and independent reasons, the Court concludes that Owens has not satisfied this burden.  First, his theory of diligence and of when he should reasonably have discovered the factual predicate for his claims – indeed, his entire explanation of the circumstances leading up to the filing of the Petition – rests primarily on his direct testimony, Carson's direct testimony, and Will's direct testimony at the evidentiary hearing before this Court.  But for the reasons explained in detail below, the Court did not find these witnesses to be credible and/or reliable.  Because Owens' theory of diligence and timeliness is not supported by trustworthy evidence, his habeas claims may not proceed under 28 U.S.C. § 2244(d)(1)(D).  Second, Owens apparently did nothing in 2000 when Carson recanted a key portion of his trial testimony from Owens' Underlying 1996 Trial, recanted other sworn testimony that he had given, and identified possible manipulation of evidence by law enforcement.  Owens' failure to follow up on those matters at that point persuades the Court that Owens did not exercise due diligence in discovering the factual basis for his claims.

<strong>1</strong>

The Court found the testimony of Owens, Carson, and Will to be unreliable and unbelievable for a host of reasons, including but not limited to the following:

---

limitations period plus the 812 days during which the limitations period was tolled.  1177 days before July 29, 2015 was May 8, 2012.

Owens' Lack of Credibility and Reliability

- Owens denied that he spoke to his brother in 2011 about the possibility of approaching Antonio and/or Carson about the possibility that they would recant. He further denied that he "ever talk[ed] to anybody about an effort to approach Antonio Williams or Joseph Carson in an effort to get them to change of recant their trial testimony." (3/20/2019 Evid. Hrg. Tr., ECF No. 19, PageID.3396.) The Court is convinced that this testimony was untrue. Tape recorded calls between Owens and his brother Will persuade the Court that, in fact, Owens and his brother were discussing the possibility of approaching these witnesses in 2011 and in early 2012 – before Carson ever spoke to Owens' mother and offered to recant. (*See generally* Respondent's Post-Hearing Br., ECF No. 28, PageID.3987-3991, identifying and summarizing content of recorded calls.)

- Owens testified that he did not learn "of the possibility" that Carson would recant until his brother and mother reported that Carson visited his mother and offered to recant. The Court concludes that that testimony was untrue. In Lawrence's February 14, 2012 letter to Owens – written months before Carson approached Owens' mother – Lawrence told Owens that, based upon his review of case materials, "[i]t appears that at one point Joseph Carson was willing to recant." (2/14/2012 Lawrence Ltr., ECF No. 28-10, PageID.4864.) This letter undermines Owens' account about how he first learned of the possibility that Carson would recant. More importantly, the letter also suggests that – contrary to Owens' theory of diligence here – there *was* reason to believe Carson may have been willing to recant well *before* Carson visited Owens' mother and offered to recant.

- Owens acknowledged that after he was convicted of shooting Antonio, he was charged with solicitation of the murder of Myron Milton. (*See* 3/20/2019 Evid. Hrg. Tr., ECF No. 19, PageID.3383.) But Owens insisted that he "never went to trial" on those charges. (*Id.*, PageID.3384.) That testimony was false. As described above, Owens stood trial on those charges in 2000. That's not something that a reliable witness would forget. Moreover, Owens had an

incentive to falsely deny that the solicitation trial had occurred – to avoid the discovery of Carson's testimony in that case. As described above, in that testimony, Carson recanted some of his testimony from the Owens' Underlying 1996 Trial and suggested that the officers who investigated the charges underlying that trial had manipulated evidence and sought false testimony. By denying the existence of the solicitation trial, Owens reduced the chance that counsel for Respondent – who was apparently unaware of the solicitation trial at the time of the evidentiary hearing in this case – would find out about it and would use Carson's testimony at that trial to suggest a lack of diligence by Owens in approaching Carson. In this sense, Owens' false and self-serving denial of the solicitation trial further undermines his credibility and reliability.

- Owens admitted that he left the State of Michigan and traveled to Tennessee the morning after Antonio was shot, but he denied that he fled the State to avoid capture for the shooting. (*See id.*, PageID.3381.) He said that the time and date of his departure – mere hours after the shooting – had been planned well in advance. (*See id.*, PageID.3395.) That claimed coincidence is not believable – especially in light of Owens' admission that while he was in Tennessee, he did not turn himself in to authorities even though he knew that he was wanted for the shooting.

- Owens testified that at his 2017 parole hearing, he identified his mother as the person he would live with if granted release. (*See id.,* PageID.3369). That testimony was false. In fact, he listed Melissa Owens, to whom he is still legally married, as the person he would live with. (*See id.*, PageID.3389-3390.) Owens' effort to downplay the closeness of his relationship with Melissa is significant because Melissa represents a potentially important link between Owens and Carson. As described below, Carson has been in a close relationship with Melissa for many years. And Respondent has argued that because Carson and Owens both shared close relationships with Melissa, it is unlikely that, as Owens now claims, he was unaware of Carson's plan to recant until Carson approached his mother. (*See* Respondent's Post-Hearing Br., ECF No. 28, PageID.3999-4000.) The Court concludes that Owens had a motive to falsely minimize his connection to Melissa in an effort to avoid an argument just like this.

- Owens testified that his family hired Lawrence "after" Carson approached his mother. (3/20/2019 Evid. Hrg. Tr., ECF No. 19, PageID.3366.) That testimony is false. Carson first approached Owens' mother in the Spring of 2012. (*See id.*, PageID.3490.) And the record contains documentation making clear that Lawrence was hired well before that visit. (*See* 6/10/2011 Lawrence Ltr., ECF No. 26-3; 2/14/2012 Lawrence Ltr., ECF No. 28-10.) Indeed, Owens now concedes that his testimony concerning the date that his family hired Lawrence was false. (*See* Owens' Post-Hearing Br., ECF No. 33, PageID.5114.) Owens dismisses this discrepancy as a mere error, not a lie: "It is not a lie precisely because there was no reason to lie and no benefit from lying." (*Id.*, PageID.5115.) The Court disagrees. Owens *did* have an incentive to testify falsely that Lawrence was not hired until Carson approached his mother. The lie decreased the chances that the Court and/or Respondent would learn about Lawrence's earlier work on Owens' behalf. And why would Owens want to hide Lawrence's earlier work? Because, as explained above, during this earlier work Lawrence discovered, and communicated to Owens, that Carson may have been willing to recant well before Carson approached Owens' mother. That communication to Owens, in turn, raises questions that Owens would have wanted to avoid, such as: since you were informed in February 2012 that Carson may have been willing to recant, why did you not approach him at that time? And: why weren't you able to determine, as Lawrence was able to determine based upon his review of your case materials, that Carson may have been willing to recant earlier? Simply put, by hiding Lawrence's earlier work, Owens increased his chances of avoiding lines of inquiry that would have been – and have turned out to be – decidedly unhelpful to claim of due diligence. Thus, the Court declines Owens' invitation to dismiss the falsity concerning Lawrence's retention date as a mere innocent error.

## Carson's Lack of Credibility and Reliability

- Carson testified that he decided to come forward to correct his testimony against Owens only after (and because) he changed his lifestyle in 2008 or 2009. (*See* 3/20/2019 Evid. Hrg. Tr., ECF No. 19, PageID.3427.) The Court disbelieves that testimony. Carson also testified that he first decided to correct his testimony when he

was incarcerated with Antonio at the Muskegon Correctional Facility (*see id.*, PageID.3408) – which was during 2000. (*See* prison records attached to Owens' supplemental brief, ECF Nos. 26-1, 26-2.) Carson said that during their joint incarceration – long before his later claimed change in lifestyle – he and Antonio "agreed to find a way we could get our testimony changed." (3/20/2019 Evid. Hrg. Tr., ECF No. 19, PageID.3408.) Thus, Carson was unable to tell a consistent story as to when and why he recognized the importance of correcting, and decided to correct, his testimony.

- As noted above, Carson claimed that he changed his lifestyle in 2008 or 2009. That testimony cannot be squared with the record. Carson admitted that after his claimed change in lifestyle, he was convicted of breaking and entering, assault and battery, and larceny by conversion. (*See id.*, PageID.3470.) The commission of these crimes is wholly inconsistent with Carson's claimed transformation.

- Carson explained that he delayed signing the Carson Recanting Affidavit because he did not want to sign that affidavit while he was on parole. He said that he was concerned that the signing of that document could lead to the commencement of parole revocation proceedings. But that explanation does not withstand scrutiny. Carson admitted that from June of 2001 through August of 2002, he was not on parole or probation of any kind. (*See id.*, PageID.3415.) Thus, if he had decided to recant in 2000 – as he claimed at one point during his testimony – it stands to reason that he would have approached the Owens family and offered to recant during his earlier period of non-supervision. Simply put, Carson's claim that being on parole led him to delay recanting cannot reasonably be squared with his earlier failure to recant – after supposedly deciding to do so – while he was not on parole or probation.[7]

---

[7] At one point in his testimony, Carson claimed that he was unwilling to recant in the early 2000s because certain unidentified federal law enforcement officers threatened that if he recanted any testimony he had given against Owens, they would "pull me over and put 650 [grams of cocaine] in my car." (3/20/2019 Evid. Hrg. Tr., ECF No. 19, PageID.3427, 3476-3482.) The Court finds this testimony to be wholly unbelievable.

- Carson told a story about a telephone conversation with Owens that occurred about five years after Owens went to jail. Carson claimed that he (Carson) was with another man (whose name he could not remember) when Owens called the other man from prison. (*See id.*, PageID.3471.) The other person, who knew that Carson had testified against Owens at Owens' trial, handed Carson the phone so that Carson could "holler" at Owens. (*Id.*) This story is non-sensical. Carson could not explain why the person handing him the phone would "think that Mr. Owens would want to talk with the guy who put him in prison." (*Id.*) Carson's claim that he and Owens had a friendly conversation after Carson testified against Owens at Owens' Underlying 1996 Trial and before Carson was willing to recant strikes the Court as not credible.

- Carson testified that he had never identified Melissa Owens as his wife or fiancé (*See id.*, PageID.3412). That testimony was false. Carson was later confronted with, and admitted the authenticity of, a letter he wrote to a parole board in 2009, identifying Melissa as his fiancé. (*See id.*, PageID.3464-3465). He also testified that Melissa's home is located at 273 Tom in Pontiac and that he has never lived there with her. (*See id.*, PageID.3411-3412). That testimony too was false. In the sworn Carson Recanting Affidavit, Carson handwrote his home address as "273 Tom Avenue" in Pontiac. (ECF No. 1-3, PageID.105). Carson further testified that he had no relationship with Melissa prior to 2008. (*See* 3/20/2019 Evid. Hrg. Tr., ECF No. 19, PageID.3463). That testimony also was untrue. Carson wrote in a January 21, 2009, letter that he and Melissa "built a home from the ground up in 2004." (*Id.*, PageID.3464-3465.) As explained above with respect to Owens, Carson's false minimization of his connection to Melissa Owens is significant because the fact that Carson and Owens both shared close links to Melissa makes less plausible Owens' claim that he was unaware of Carson's long-held intent to recant the testimony Carson provided at Owens' Underlying 1996 Trial.

- Carson conceded that certain statements in the sworn Carson Recanting Affidavit do not make sense, and he appeared to minimize the significance of being accurate in a sworn affidavit. For instance, Carson swore in the Carson Recanting Affidavit that before 2012, he had "refused any attempt to be interviewed or to

discuss the matters" addressed in the affidavit. (*See* ECF No. 1-3, PageID.105.) On cross-examination, however, Carson admitted that nobody had asked him to discuss these matters and that he could not make sense of his use of the word "refused." (3/20/2019 Evid. Hrg. Tr., ECF No. 19, PageID.3423-3424). Carson dismissed any lack of clarity in his affidavit as just "word semantics" and said that the sworn statements in his affidavit were just "for general purpose of the conversation." (*Id.*, PageID.3423). Carson's lack of concern for the accuracy of the statements in his sworn affidavit makes him a less credible witness.

Will's Lack of Credibility and Reliability

- Will testified on direct examination that Lawrence was not hired until 2012 – after Carson contacted his mother. (*See id.*, PageID.3494.) As noted above, that testimony is not true. Owens dismisses this falsity as a mere error on the ground that Will had no reason to lie about the retention date, But, for the reasons explained above, the Court rejects that argument and finds that the falsity of this testimony raises serious questions about the veracity of the remainder of Will's testimony.

For all of the reasons explained above, the Court does not find the testimony of Owens, Carson, and Will to be trustworthy, reliable, and/or credible. Accordingly, that testimony is insufficient to support a finding that, through the exercise of due diligence, Owens could not have learned the factual predicate of his claims before May 8, 2012. Indeed, the testimony is so unreliable that it could not support *any* finding as to when the factual predicate for Owens' claims could have been discovered through the exercise of due diligence, and it so untrustworthy that it cannot support a finding that Owens exercised due diligence. Accordingly, Owens

has failed to carry his burden under 28 U.S.C. § 2244(d)(1)(D), and his habeas claims are not timely under that statute.[8]

## 2

Owens' theory that he exercised due diligence in discovering the factual predicate of his claims also fails because he did not follow up on Carson's testimony at the 2000 solicitation trial. As described above, in that testimony, Carson testified that after he spoke to Owens about Milton at the parole office, he (Carson) had no further communications with Owens relating to Milton. That testimony denying any additional meetings with Owens is directly contrary to – and amounts to a sworn recantation of – Carson's testimony from Owens' Underlying 1996 Trial that after he met Owens at the parole office, he attended the additional key meeting on Montana Street with Owens, Akemji, Antonio, and others. Likewise, as further described above, during the 2000 solicitation trial, Carson recanted other sworn testimony that he had given against Owens during the preliminary examination in that case. Thus, Owens had first-hand knowledge in 2000 that Carson had recanted a portion of his testimony from Owens' Underlying 1996 Trial and that Carson may

---

[8] Owens repeatedly argues that he could not have sought relief from his convictions until both Carson and Antonio were willing to sign their recanting affidavits. That may be true, but it does not establish that his claims are timely. As explained in detail above, the testimony concerning how and when Carson and Antonio were willing to recant and sign their affidavits is untrustworthy and not credible. Thus, Owens has not persuaded the Court that Carson and Antonio would have declined to sign their affidavits earlier.

be willing to recant other sworn testimony. Finally, during the 2000 solicitation trial, Carson testified that the investigating officers – the same officers involved in the charges at issue in Owens' Underlying 1996 Trial – had manipulated recordings of their interview with him in order to enhance the inculpatory value of his statements and may have urged him to testify falsely. Thus, Owens had knowledge of potential law enforcement misconduct as early as 2000.

Yet, there is no indication that Owens did anything to follow up on this testimony by Carson. He did not reach out to Carson in 2000 and did not contact Antonio at that time to learn whether Antonio was also willing to recant and/or had had a similar experience with law enforcement officers manipulating evidence. Nor is there any indication that Owens contacted an attorney in 2000 to explore obtaining relief based upon Carson's 2000 recanting testimony and identification of potential misconduct by law enforcement officers. Owens' failure to follow-up on Carson's 2000 testimony precludes a finding that he exercised due diligence in discovering the factual predicate of his claims.[9]

---

[9] During the evidentiary hearing before this Court, Owens said that if he had learned before 2012 that Carson had recanted or was willing to recant, he (Owens) would have "taken immediate action," including "hir[ing] an attorney" to pursue relief. (3/20/2019 Evid. Hrg. Tr., ECF No. 19, PageID.3500.) This testimony confirms that the Court is not holding Owens to an unreasonable standard when it concludes that he should have followed up on Carson's testimony at the 2000 solicitation trial at that time and that his failure to do so amounts to a lack of due diligence.

Moreover, Owens has failed to persuade the Court that it would have been futile for him to seek cooperation from Carson and Antonio in or around 2000. Indeed, Owens' own witness – Carson – testified that he and Antonio jointly decided to recant some time during 2000 and that the obstacle to his (Carson's) recanting (being on parole) did not exist for eighteen months in the early 2000s. Likewise, in the Antonio Recanting Affidavit, Antonio did not say that he was ever hesitant to recant.[10] Given Owens' failure to follow up on Carson's testimony from the 2000 solicitation trial, the Court cannot find that Owens exercised due diligence in discovering the factual basis for his habeas claims. For this additional reason, the claims are not timely under 28 U.S.C. § 2244(d)(1)(D).

## C

In the alternative, Owens argues that he is entitled to equitable tolling of the limitations period. A habeas petitioner is entitled to equitable tolling "if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). A petitioner may also establish entitlement to equitable tolling if he can establish that

---

[10] As noted below in Section (II)(C), Lawrence says in an affidavit that Antonio was initially unwilling to sign a recanting affidavit. But for the reasons explained below (*see* fn. 11), the Court does not find Lawrence's statement on this point to be reliable – especially in light of the fact that Antonio did not say in the Antonio Recanting that he was ever unwilling to recant.

he is actually innocent. *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). The Court declines to equitably toll the limitations period on either of these bases.

First, for all of the reasons explained above, the Court concludes that Owens has failed to present reliable and credible evidence that he has been pursuing his rights diligently. As explained above, the evidence presented by Owens is not sufficiently trustworthy to support any findings as to what Owens has been doing with respect to the pursuit of his claims.

Second, Owens has not established his actual innocence. A claim of actual innocence must be supported with "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness account, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). A court presented with new evidence must consider it in light of "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal citation and quotation marks omitted). "Based on this total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *Id*. (quoting *Schlup*, 513 U.S. at 329). This standard does not require absolute certainty about the petitioner's guilt or innocence:

> A petitioner's burden at the gateway stage is to
> demonstrate that more likely than not, in light of the new

> evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.

*House*, 547 U.S. at 538.

Owens has not presented sufficiently reliable evidence to prevail on his actual innocence claim. As explained above, the actual innocence evidence from Owens and Carson is neither reliable nor trustworthy. And the remaining actual innocence evidence – the Antonio Recanting Affidavit – is not sufficient, standing alone, to establish Owens that Owens is actually innocent.

The Antonio Recanting Affidavit falls short of establishing Owens' actual innocence for several reasons. As an initial matter, recanting affidavits like this "are always viewed with 'extreme suspicion.'" *Williams v. Coyle*, 260 F.3d 684, 708 (6th Cir. 2001) (quoting *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991)). Moreover, the record contains contradictory evidence concerning Antonio's willingness to recant. Carson testified that Antonio decided to recant in 2000 but could not do so at that time because he was in prison. (*See* 3/20/2019 Evid. Hrg. Tr., ECF No. 19, PageID.3408.) However, there is no indication that Antonio came forward to recant after he was released from prison and no explanation in the record for his failure to do so. Furthermore, Lawrence reports that when he (Lawrence) first approached Antonio about recanting in 2012, Antonio initially refused to do so. (*See* Lawrence 10/28/2018 Aff. at ¶¶ 7-9, ECF No. 12-3, PageID.3314.) That, too,

is inconsistent with Carson's claim that Antonio had been willing to recant since 2000. Moreover, unlike Carson, Antonio did not say in the Antonio Recanting Affidavit that he was ever unwilling to recant. That omission seems inconsistent with Lawrence's report that Antonio was initially unwilling to recant. Finally, the account of how Antonio came to sign the Antonio Recanting Affidavit comes largely from Lawrence (*see id.* at ¶¶ 6-10, ECF No. 12-3, PageID 3314), and there is reason to doubt the reliability of Lawrence's recollections in this matter.[11] For all of these reasons, the Court concludes that the Antonio Recanting Affidavit, standing alone,

---

[11] In a sworn affidavit, Lawrence attested that he "had never heard of Owens, Carson, or [Antonio] Williams before 2012." (Lawrence 10/28/2018 Aff., ECF No. 12-3, PageID 3313.) That was not accurate. As explained above, Will first contacted Lawrence on Owens' behalf in 2009, and Owens first hired Lawrence in 2011. And in Lawrence's letter to Owens (with a copy to Will) dated June 10, 2011, Lawrence identified Carson and Antonio as key trial witnesses against Owens and provided a review of their testimony at Owens' Underlying 1996 Trial. (*See* 6/10/2011 Lawrence Ltr., ECF No. 26-3, PageID.3954.) Moreover, at the evidentiary hearing before the Court, Lawrence elicited testimony from Will that Lawrence should have known was inaccurate. Lawrence obtained from Will testimony that (1) Will had not hired an attorney on Owens' behalf before Carson contacted Owens' mother and said he would recant and (2) Will had not even heard of Lawrence until Will learned that Carson had contacted Owens' mother. (*See* 3/20/2019 Evid. Hrg. Tr., ECF No. 19, PageID.3494.) However, as noted above, the record makes clear that (1) Will made the initial contact with Lawrence in 2009 that led to Lawrence's retention (*see* Lawrence 4/22/2019 Aff. at ¶2, ECF No. 20, PageID 3514) and (2) Lawrence sent correspondence to Will and met with Will in 2011 and February 2012. (*See* Lawrence 6/10/201 Ltr., ECF No. 26-3; Lawrence 2/14/2012 Ltr., ECF No. 28-10.) The Court does not mean to suggest that Lawrence has been intentionally untruthful or misleading in his handling of this case, but there is reason to doubt the accuracy of his recollections – which include, of course, his account of Antonio's conduct in connection with the Antonio Recanting Affidavit.

is not sufficient to establish Owens' actual innocence, and the Court declines to toll the statute of limitations based on Owens' actual innocence claim.

### III

In order to appeal the Court's decision, Owens must obtain a certificate of appealability, which requires a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). To demonstrate this denial, Owens must show that reasonable jurists could debate whether the Petition should have been resolved in a different manner, or that the issues presented are adequate to deserve encouragement to proceed further. *See Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *See Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002).

Here, jurists of reason would not debate the Court's conclusion that Owens has failed to demonstrate entitlement to habeas relief because the Petition is barred by expiration of the statute of limitations. Reasonable jurists would also not debate that Owens has failed to demonstrate grounds for equitable tolling based on his claimed actual innocence. Therefore, a certificate of appealability is **DENIED**.

# IV

For all of the reasons stated above, the Court (1) **DENIES WITH PREJUDICE** Owens' petition for a writ of habeas corpus (ECF No. 1) and (2) a Certificate of Appealability is **DENIED**.

    **IT IS SO ORDERED.**


                    s/Matthew F. Leitman
                    MATTHEW F. LEITMAN
                    UNITED STATES DISTRICT JUDGE

Dated:  February 20, 2020

    I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 20, 2020, by electronic means and/or ordinary mail.

                    s/Holly A. Monda
                    Case Manager
                    (810) 341-9764